**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VERTEX ENERGY, INC., *et al.*,[1] | ) | Case No. 24-90507 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF R. SETH BULLOCK, CHIEF
RESTRUCTURING OFFICER OF VERTEX ENERGY, INC., IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, R. Seth Bullock, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Vertex Energy, Inc. ("VEI," and together with the other above-captioned debtors and debtors in possession, the "Debtors," and collectively with their non-debtor affiliate, "Vertex" or the "Company"). I am also a Managing Director of Alvarez & Marsal North America, LLC ("A&M"). A&M is the proposed financial advisor to the Debtors in the above-captioned chapter 11 cases. I was appointed as the CRO of Vertex on July 24, 2024.

2.      I have over twenty years of restructuring and distressed investment experience across the energy spectrum, including in exploration and production, midstream, biofuels, renewables, power, refining, and marketing. I have served as (a) Chief Restructuring Officer, among other key leadership positions, of Limetree Bay Terminal, Titan Energy, Maverick Natural Resources, and Penn Virginia; (b) Financial Advisor to JUUL Labs, California Resources Corporation, Whiting Petroleum, Extraction Oil & Gas, Chisholm Oil & Gas,

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/vertex.  The location of Debtor Vertex Energy, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1331 Gemini Street Suite 250, Houston, Texas 77058.

Weatherford International, Legacy Reserves, Energy XXI, Arsenal Resources, Samson Resources, Azure Midstream, Vantage Drilling, and GulfMark Offshore; (c) Interim Chief Financial Officer for various notable distressed companies, including SiO2, Par Petroleum, Platinum Energy Solutions, and Surefire Industries; and (d) Interim Chief Executive Officer of Bonanza Creek Energy.  In each of these situations, I have led the review and development of cash flow forecasts and strategic and operating plans, the evaluation of capital structure alternatives, and the negotiation and implementation of restructuring transactions.

3.      I earned my bachelor's degree in finance from Loyola University.  Since then, I have worked in various restructuring roles, and I have been employed by A&M since 2014.  I am currently a Co-Head of A&M's North American Commercial Restructuring Practice ("NACR") for its Southern region and on NACR's Executive Committee.  A&M is a global business advisory firm that, together with its affiliates, employs over 10,000 professionals in over 80 offices worldwide.  Prior to the date hereof (the "Petition Date"), A&M was engaged by the Debtors to help manage their liquidity, identify strategic alternatives to enhance liquidity and profitability, and assist with the development of a business plan, and contingency planning.

4.      As CRO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (the "Declaration") to help the Court and interested parties understand why the Debtors filed these chapter 11 cases and in support of the relief requested in the motions filed along with the Debtors' chapter 11 petitions (collectively, the "First Day Motions").  I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to smoothly transition into chapter 11 and to continue their ordinary course operations on a postpetition basis.

5.     The statements in this Declaration are, except where otherwise noted, based on (a) my personal knowledge, (b) information obtained from other members of the Debtors' management team, employees, advisors, and/or employees of A&M, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and (d) my opinions based upon my experience and knowledge.  I am over the age of eighteen, and I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Introduction[2]

6.     Vertex was founded in 2001 by Benjamin P. Cowart, the Company's Chief Executive Officer.  Vertex began as a used motor oil ("UMO") supplier based in Houston, Texas, supplying UMO to third parties in the Gulf Coast region.  Over the next twenty-three years, Vertex retained its headquarters in Houston but grew to become a leading energy transition company and marketer of high-quality refined products.  Today, the Company employs approximately 480 people who support the Company's operations in Texas, Alabama, Oklahoma, Louisiana, Mississippi, and Arkansas.  Vertex maintains three principal business segments:

(a)     **Conventional Refining**.  Vertex owns and operates a refinery located near Mobile, Alabama (the "Mobile Refinery"), which is competitively situated in the U.S. Gulf Coast region to optimize the Company's distribution of refined products throughout the southeastern United States, addressing critical energy needs in the region.

(b)     **UMO Operations**.  Vertex directly collects UMO and related co-products from thousands of locations across the U.S. Gulf Coast and then recycles them through the largest "re-refining" processing and blending program in the state of Louisiana.  Through this process, Vertex converts UMO into, among other things,

---

[2]     Capitalized terms used but not defined shall have the meanings ascribed to them elsewhere in this declaration or in the Restructuring Support Agreement, attached hereto as **Exhibit A**.

vacuum gas oil and low sulfur marine fuels that can be reused by the Company's customers.

(c) **Renewable Fuel Refining**.  In June 2023, Vertex completed the conversion of one section of the Mobile Refinery to produce renewable diesel and other finished renewable fuel products.  However, due to delays and other factors that I discuss in more detail below, the Company paused its renewable fuels production during the second quarter of 2024 and returned the Mobile Refinery to 100 percent conventional fuel operations.  Although the conversion back to the production of renewable fuels is expected to be completed in October 2024, the Mobile Refinery retains the ability to resume production of renewable products in the future.

7.     Vertex's story has primarily been one of growth and expansion since its inception in 2001.  Despite this steady and prolonged positive momentum, the Company's more recent attempt to capitalize on the growing market for renewables fell short of expectations due to various headwinds that I will discuss in more detail below.

8.     Over the past two decades, the Company's ability to anticipate and evaluate industry trends was a large contributor to its growth.  This foresight allowed Vertex to successfully complete a number of horizontal and vertical acquisitions that fueled its transformation into a multidimensional energy company with various business lines.  Several years ago, a new industry trend began to emerge—the acute rise in demand for biofuel, which was primarily driven by the evolving regulatory landscape.  Various state and national policies aimed at reducing the use of fossil fuels and improving air quality, such as the federal Renewable Fuel Standard program (the "RFS Program") and California's low-carbon fuel standard ("LCFS") program,[3] grew in prominence and increased demand for renewable energy products.

9.     For instance, statewide programs like California's LCFS, offer incentives to customers who purchase renewable diesel and requires conventional fuels to be blended with

---

[3]   While the RFS Program mandates that a minimum volume of renewable fuels be blended into transportation fuels, the LCFS sets an annually increasing targeted reduction in transportation-related carbon emissions.

biofuels that dilute their conventional carbon components.  This combination of regulatory mandates and financial incentives translated to a significant increase in consumer demand for biofuel,[4] and the prices for renewable diesel soared.  In light of this trend, Vertex observed that refining companies with renewable diesel capabilities had a considerable—and lucrative— advantage.

10.     Eager to capitalize on the national rise in demand for "greener" fuels, the Company—like many other United States ("U.S.") fuel makers at the time—turned to biofuel development, with a particular focus on renewable diesel.  In order to seize on this opportunity, the Company decided to pivot a segment of its conventional fuel capabilities at the Mobile Refinery to renewable diesel production in 2021.  At the time, Vertex saw this as an opportune way to use its existing distribution infrastructure to address this growing market.  Importantly, the Company believed that renewable diesel could be (a) seamlessly blended, transported, and even co-processed within the Company's current fuel production channels, (b) transported in Vertex's existing petroleum pipelines, and (c) sold at retail stations across the country, either as a blended product or in its independent state.  Renewable diesel was not only a sizable growth opportunity, but also an industry shift that the Company was especially well-positioned to seize.

11.     In order to make the most of this moment, Debtor Vertex Refining Alabama LLC ("Vertex Refining") entered into an agreement with Matheson Tri-Gas, Inc. ("Matheson") on June 11, 2022, pursuant to which Matheson agreed to build, own, operate, and maintain a steam

---

[4]    California's renewable diesel consumption grew substantially after its LCFS went into effect in 2011. Between 2011 and 2021, consumption grew from 1 million barrels to 28 million barrels per year, over 18 times its original volume.  Almost all U.S. renewable diesel is consumed in California; most isn't made there, U.S. Energy Information Administration (July 20, 2023), https://www.eia.gov/todayinenergy/detail.php?id=57180#:~:text=California's%20renewable%20diesel%20cons umption%20grew,18%20times%20its%20original%20volume.

reformer hydrogen facility (the "<u>Hydrogen Facility</u>")[5] in one section of the Mobile Refinery (the "<u>Matheson Agreement</u>") to secure the hydrogen supply necessary to expand the Mobile Refinery's renewable diesel operations.  Upon completion, a part of the Mobile Refinery's existing refining infrastructure would be reformatted to begin producing renewable diesel.

12.     Construction of the Hydrogen Facility was intended to facilitate the next chapter of the Debtors' businesses; however, the project began experiencing problems almost immediately.  Construction delays and cost overruns have plagued the project since its inception, which stagnated the Company's attempt at becoming a leader in renewable diesel production. As a result, the Mobile Refinery was only ever able to produce around half of the originally projected 14,000 barrels-per-day ("<u>bpd</u>") of renewable diesel.[6]  Amid the construction delays, many other U.S. refiners recalibrated their plants and began producing renewable diesel—as a result, a supply surplus for low-emission biofuels emerged that hammered profit margins and threatened to implode the growing renewable diesel sector as a whole.

13.     To make matters worse, just as the Company was grappling with the construction delays at the Mobile Refinery and an increasingly competitive renewable diesel market, Vertex was also feeling the pressure from mounting obligations under the federal RFS Program.  The RFS Program requires "obligated parties" (*e.g.*, fuel blenders, refiners, or importers) to blend a minimum amount of on-road transportation biofuels, such as gasoline mixtures that incorporate renewable products like ethanol.  The specific amount of blended fuel that an obligated party is

---

[5]     The Hydrogen Facility facilitates a process by which methane is heated, with steam and a catalyst, to produce a mixture of carbon monoxide and hydrogen that is then used in organic synthesis and as a fuel.

[6]     Accordingly, the Debtors have determined in a sound exercise of their business judgment that it is in the best interests of all stakeholders to reject the Matheson Agreement and have filed a motion contemporaneously herewith seeking rejection of the Matheson Agreement as of the Petition Date.

required to produce is referred to as its "renewable volume obligation."[7]  If obligated parties are unable to produce enough biofuels under the RFS Program, they accrue monetary obligations payable to the federal government.

14.     The U.S. Environmental Protection Agency ("EPA") sets the renewable volume obligations annually based on a variety of factors including, among other things, current climate change policy, commodity prices, the availability of inputs, costs, and air quality.[8]  Just as Vertex and the rest of the private sector responded to the sharp increase in biofuel demand, so too did the EPA—the Agency saw the moment as an opportunity to increase the renewable volume obligations *even more* to encourage *even faster* adoption of renewable fuels.  Accordingly, in 2023, the EPA ruled that the total renewable volume obligations would increase by 120 million gallons year-over-year, which required fuel refiners like Vertex to blend nearly 21 billion gallons of renewable fuel in 2023 and 21.5 billion gallons in 2024.

15.     The Company was unable to meet its renewable volume obligations through production because of the persistent issues at the Mobile refinery—and, even if it could have, doing so would not have been as profitable as projected because of the biodiesel supply surplus that had formed.  Accordingly, as time went on, the Company continued to accrue substantial obligations under the RFS Program that it could not offload—by the end of Q1 of 2025, the Company estimates that such obligations will total approximately $72.3 million.[9]

---

[7]  An obligated party's renewable volume obligation is based on the percentage of the gasoline and diesel fuel that the refiner produces or imports into the U.S., or, if the refiner is a renewable fuel exporter, the volume of renewable fuel that the exporter exports outside of the U.S.

[8]  R*enewable Fuel Standard Final Rule – 2023, 2024, 2025: Increases Short of Expectations* (June 30, 2023), OKLAHOMA FARM REPORT,  https://www.oklahomafarmreport.com/okfr/2023/06/30/renewable-fuel-standard-final-rule-2023-2024-2025-increases-short-of-expectations/.

[9]  By the end of Q1 2025, the Company currently anticipates that it will have accrued approximately $72.3 million in obligations under the RFS Program related to 2023 and 2024 production activity.

16.     Over the past couple of years, in addition to the growing volume obligations, there has been a significant decline in what are known as "crack spreads," which is an industry proxy for projected profitability that captures the difference between the price of gasoline and the cost of crude oil.  Specifically, the Company utilizes the common "2-1-1" crack spread[10] to track the directional profitability of certain refining configurations.  The crack spread and the profitability of the Company's refining operations more generally both became compressed during this period and were difficult to predict due to the market volatility.



17.     Thus, in 2023, the Company faced a "perfect storm" made up of the looming renewable volume obligations, a shell of a Hydrogen Facility, unstable crack spreads, and a surplus of renewable energy supply in the market.  Simply put, the rich renewables market that the Company once projected and planned for was slipping away just as crack spreads more generally were compressing.  These challenges, combined with deteriorating liquidity and the impending maturity of a significant portion of the Company's debt load, placed considerable strain on Vertex's business.  In response, in late 2023, the Company explored a potential sale of

---

[10]     The 2-1-1 crack spread measures the profitability of converting two barrels of crude oil into one barrel of gasoline and one barrel of diesel.

certain of the Company's assets, including the renewable diesel segment of the Mobile Refinery. However, by spring of 2024, no actionable transactions materialized, and the Company suspended its marketing process.

18.     Thereafter, in summer of 2024, the Company, with the assistance of A&M as its financial advisor, Perella Weinberg Partners LP ("PWP") as investment banker, Kirkland & Ellis, LLP ("K&E") and Bracewell LLP ("Bracewell") as legal counsel (collectively, A&M, PWP, K&E, and Bracewell, the "Advisors"), engaged in discussions with an ad hoc group of certain holders of the first lien term loan claims (the "Consenting Term Loan Lenders"), represented by Sidley Austin LLP, as counsel, and Houlihan Lokey, as investment banker.  The Company, with the assistance of its Advisors, evaluated potential in-court and out-of-court solutions and continued to engage with the Consenting Term Loan Lenders regarding the potential terms of a value maximizing transaction.  During the course of these discussions, it became clear that any viable path forward would require incremental liquidity to address the Company's immediate cash needs.

19.     On July 24, 2024, the Company sought and received $20 million in incremental funding from a third-party lender under the Company's prepetition term loan facility.  Over the next several weeks, the Debtors and the Consenting Term Loan Lenders continued to discuss the potential terms of a value maximizing transaction; however, by mid-August 2024, it became clear that the only way to right size the Company's balance sheet and address certain material liabilities was through an in-court restructuring process.  To extend the Company's runway and allow the parties' negotiations to continue in earnest, the Consenting Term Loan Lenders provided the Company with a $25 million "bridge loan" on August 23, 2024, under the

prepetition term loan facility, and the Debtors focused on preparing for an orderly transition into chapter 11.

20.     In the weeks that followed, the Debtors, the Consenting Term Loan Lenders, and the DIP Lenders worked around the clock to negotiate (a) debtor-in-possession financing to fund the Company's operations during these chapter 11 cases, (b) a restructuring support agreement (the "Restructuring Support Agreement"), which is attached hereto as **Exhibit A**, and (c) a related chapter 11 plan (the "Plan"), which has been filed contemporaneously herewith. While these negotiations were ongoing, the Debtors simultaneously engaged with certain contract counterparties under various forward contracts, including Macquarie North America Trading Inc. ("Macquarie") and Shell Trading (US) Company (together with certain of its affiliates, "Shell"), to secure their commitment to continue performing under the Company's critical intermediation facility during these chapter 11 cases.  As described in various First Day Motions accompanying my declaration, these commitments will allow the Debtors to meet their working capital needs and, in turn, operate in the ordinary course of business during these chapter 11 cases.

21.     During these discussions, it was clear to both the Debtors and the Consenting Term Loan Lenders that a prolonged in-court process would be detrimental to all stakeholders and that efficiency was paramount.  The Restructuring Support Agreement and the Plan provide a clear path forward to meet those objectives.

22.     Specifically, the Company began a marketing process on September 3, 2024, for some or all of the Debtors' assets, which the Company proposes to continue postpetition.  The initial indications of interest ("IOIs") that result from that process will give the Debtors a clear picture of the ultimate shape these chapter 11 cases will take.  Pursuant to the proposed bidding

procedures,[11] if the Debtors receive one or more IOIs for an actionable proposal, the Debtors will move swiftly toward an auction, where the Consenting Term Loan Lenders will also have an opportunity to submit a credit bid.  If the Consenting Term Loan Lenders decline to do so, the Debtors will continue down the plan confirmation process.  Ultimately, the Debtors expect to reach the effective date of the Plan through either (a) a standalone recapitalization of the Company's balance sheet (the "Recapitalization Transaction") or (b) following a sale of all, substantially all, or any portion of the Debtors' assets through one or more sales (the "Asset Sale").  Critically, as provided in the Restructuring Support Agreement, in the event that the Debtors pursue an Asset Sale, the Consenting Term Loan Lenders have agreed to fund a wind-down reserve to (a) satisfy the estimated fees, costs, and expenses necessary to fully administer and wind down the Debtors' estates and (b) pay in full all claims required to be paid under the Plan and the Bankruptcy Code.[12]



---

[11]   The terms of the proposed bidding procedures are described in more detail in the Bidding Procedures Motion, filed contemporaneously herewith.

[12]   The Restructuring Term Sheet and the DIP Term Sheet are attached as Exhibits B and C to the Restructuring Support Agreement, respectively, and describe the wind-down reserve in greater detail.

23.     Conversely, in the event the Debtors proceed with the Recapitalization Transaction, there are a number of key issues that they will need to address during this process, including, among other things, resolving the approximately $72.3 million in obligations that the Company currently estimates it will have accrued under the federal RFS Program by the end of Q1 2025, negotiating an amended intermediation facility with Macquarie or a new third party, and/or sourcing exit financing.

24.     To further familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this declaration is organized into four sections as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** offers detailed information on the Debtors' prepetition organizational structure, capital structure, and other obligations;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

## Part I: Corporate History and Business Operations

### A. The Company's History.

25.     Vertex's business was formed over time much like the refined products it produces—with a healthy amount of hard work, precision, and transformation. However, the Company's story truly begins many years before VEI was ever incorporated.

26.     Mr. Cowart—at sixteen years old—asked his brother for a job at Alabama-based Aaron Oil Company, Inc. ("Aaron Oil"), a UMO collection business. His brother obliged, and Mr. Cowart began working at Aaron Oil as an entry-level truck driver collecting used oil.

During his fifteen-year tenure, he was promoted first to Manager and ultimately to Vice President, progressively learning and refining his knowledge of the industry along the way.

27.     Over the span of these fifteen years, Mr. Cowart also came to observe the gaps in the UMO industry, and in 2001, he relocated from Alabama to Houston to launch Vertex as a new kind of UMO company.  In the beginning, Vertex was singularly focused on the collection and supply of UMO to businesses throughout the Gulf Coast; however, Mr. Cowart aspired for Vertex to do much more—he believed the Company's competency in sourcing and management of distressed hydrocarbon streams could be revolutionary.  In support of that aim, Vertex patented its proprietary Thermal Chemical Extraction Process[13] in 2008 after years of development, which allowed Vertex to grow its "re-refining"[14] arm and, in turn, increase the Company's profits.

28.     On April 16, 2009, Vertex became a public company after successfully merging with World Waste Technologies, Inc., trading on the Over-The-Counter Bulletin Board under the symbol "VTNR.OB".  At the time, Vertex was primarily a feedstock logistics and processing company.  In this context, the term "feedstock" refers to the raw materials that are used for the processing or manufacturing of other products (*e.g.*, crude oil is a "feedstock" for gasoline because it is an input necessary to produce gasoline).  Over time, the Company continued to grow and eventually transformed from a small, Texas-based company into a regional leader in collection, aggregation, and processing of UMO and other off-spec hydrocarbon streams.

---

[13]    The Thermal Chemical Extraction Process is a method of removing UMO from oil co-products by applying heat and other chemical reactions to extract the UMO.

[14]    Re-refining is a refining method that reprocesses used oil into a high-quality base oil that can be used to make lubricants and other products.

29.     Equipped with greater capital and steadfast in its goals for expansion, the Company made a series of strategic acquisitions, including the purchase of multiple re-refineries, and ultimately entered the finished products market.  Specifically, from 2012 to 2021, Vertex acquired the key assets of Vertex Holdings, L.P. (2012), Omega Holdings Company, LLC (2014), Heartland Group Holdings, LLC (2014, divested in 2023), Nickco Recycling, Inc. (2017), and the equity interests of Crystal Energy, LLC (2020).  Finally, in 2022, Vertex purchased the Mobile Refinery from Shell, which is strategically located on the Gulf Coast near Mobile, Alabama.  To support the Mobile Refinery's operable refining capacity of approximately 75,000 bpd, Vertex also purchased the related logistics infrastructure and hydrocarbon inventory from Shell.

30.     Through this decade-long period of growth through acquisitions, Vertex established a robust portfolio of high-purity fuels, lubricants, and reprocessed feedstocks (*i.e.*, output).[15]  Vertex also began to expand beyond production derived from conventional feedstocks (*i.e.*, fossil feedstock—consisting of coal, oil, and natural gas) and sustainable sources (*i.e.*, used engine oil and other petroleum-derived materials) to invest in renewable feedstocks (*i.e.*, water and biomass—or any resource that can replenish itself through natural processes).

**B.  The Company's Operations.**

31.     Vertex has generated revenue through three primary business segments, including through (a) conventional refining, (b) UMO operations, and (c) renewable fuel refining, each of which I discuss more fully below.

---

[15]  Output refers to the total volume of products that refineries produce after refineries process feedstocks, constituting the "input."

1.  **Conventional Refining.**

32.     Vertex owns and operates strategic refining assets along the Gulf Coast, positioning it as a principal supplier of conventional fuels in the region.  Through this business segment, Vertex engages in the refining of crude oil and other feedstocks, as well as the distribution of the refined products across the southeastern United States once the refining process is complete.  The primary asset supporting the Company's conventional refining operations is the Mobile Refinery, which is strategically located on the Gulf Coast to take advantage of both land-based and waterborne distribution and supply channels.

33.     As previously discussed, the Mobile Refinery is capable of processing approximately 75,000 barrels of crude oil per day and is made up of a complex web of related logistics assets located in and around the Mobile, Alabama area, including (a) a deep-water draft port, which facilitates the loading and unloading of large vessels close to shore, (b) various third-party storage terminals, and (c) a high-capacity bulk loading terminal facility on Blakely Island in Mobile, Alabama, which is capable of storing more than 1.5 million barrels of crude oil and associated refined petroleum products.



34.     The Mobile Refinery is equipped with two marine docks located in Saraland, Alabama, a small city of roughly 16,000 people located about ten miles north of Mobile, Alabama.  This location is important not only because it provides simultaneous access to waterways and land-based distribution methods, including the Jay Field pipeline, but also because the refinery has become a vital contributor to the local economy and surrounding communities.  The refinery in Saraland is physically connected to the

Blakely Island terminal facility in Mobile by a pipeline network, further reinforcing its role as an integral part of the local industry and economy.

35.     Although the refining process of conventional fuels involves many highly specialized steps that vary depending on the type of product that is ultimately produced, the overall undertaking as it relates to Vertex's business is relatively simple.  ***First***, the crude oil and other feedstocks arrive either (a) at the Blakely Island terminal facility in Mobile by barge or ship or (b) directly at the refinery in Saraland by barge or pipeline.  Eventually, all of the inputs begin the refining process at the Saraland refinery—any materials that are first delivered to the Blakely Island terminal facility are transferred via pipeline to the refinery in Saraland for processing.  ***Second***, the refining process converts the crude oil and other feedstocks into finished products.  Today, those outputs primarily include regular gasoline, premium gasoline, jet fuel, and diesel fuel.  ***Third***, the finished products exit Vertex's facilities either through water distribution points capable of supplying waterborne vessels or what is known as a "high-capacity truck rack," which allows tanker trucks to extract the products with low wait times.  On average, the high-capacity truck rack supplies greater than 175 tanker trucks per day at a rate of 600 gallons per minute.  ***Finally***, the refined products reach the Company's customers, which are located primarily in the southeastern United States.  The Company's conventional refining business segment is responsible for generating the vast majority of the Debtors' revenue, representing more than 80 percent of the Debtors' conventional refining operations.

### 2.  UMO Operations.

36.     In addition to the Company's conventional refining business, Vertex operates one of the largest oil recycling and recovery operations on the Gulf Coast, with a logistical reach that covers most of the United States.  The Company collects, recycles, and recovers UMO and other

used materials from a variety of companies that range from independently owned businesses to global enterprises.

37.     Debtor H&H Oil, L.P. ("H&H Oil") operates a large fleet of sixty-eight collection vehicles that routinely visit various oil generators, such as oil change service stations, automotive repair shops, manufacturing facilities, petroleum refineries, and petrochemical manufacturers to perform various collection services, including purchasing used motor oil, oil filters, antifreeze, oily absorbents, and other industrial oils.  To supplement this business line, Vertex also aggregates used oil from an established network of approximately thirty local and regional collectors who operate similar collection businesses.

38.     Currently, the Company offers its collection services in Texas, Oklahoma, Louisiana, Arkansas, and Alabama.  In addition to the sixty-eight collection vehicles, the Debtors operate thirteen aggregation facilities, thirty transportation vehicles, and 173 leased railcars, and they have more than 8 million gallons of storage capacity.  In 2023 alone, Vertex aggregated and collected approximately 68 million gallons of used motor oil and other petroleum by-product feedstocks.



39.     Once collected or aggregated, Vertex manages the storage, sale, and ultimate delivery of the UMO and related products to one of its UMO "re-refining" facilities or to its customers, who, in turn, use the material as a feedstock or as replacement fuel for industrial burners.  The Company typically sells UMO in bulk in order to ensure efficient transportation and delivery, which occurs by truck, rail, or barge.  In many cases, Vertex has purchase and sale

agreements with suppliers and customers. These agreements are the key to maintaining the adequate flow of used oil into and out of the Company's storage facilities because they ensure that a minimum volume is sold from suppliers to Vertex, that a minimum volume is thereafter purchased by the Company's customers, and that the Company is able to effectively minimize its inventory risk.

40.     Notwithstanding the foregoing, most of the UMO and related products that Vertex collects or aggregates is not immediately sold. The Company's Marrero re-refining facility is where the collected UMO undergoes the process that turns UMO into vacuum gas oil,[16] which can be used to feed refinery operations and as a low sulfur fuel for ships. The forty-employee Marrero re-refining facility occupies 4.5 acres strategically located along the West Bank of the Mississippi River, which allows the Company to leverage truck, barge, and rail logistics to optimize the transport of materials into and out of the facility. Of the 68 million gallons of UMO that the Company collected and aggregated in 2023, 60 million gallons were re-refined at the Marrero refinery for use as marine fuels, in asphalt products, or as various intermediate feedstocks necessary for the conventional refining process.

41.     In connection with the Company's UMO collection and re-refining activities, the Debtors also manage several processing facilities across the Gulf Coast states that provide recycling and scrap services to various companies in both the land and marine industries. Vertex's North Texas facility, which is held by Vertex Recovery, L.P., is the largest of the recycling facilities and



---

[16]     Vacuum gas oil is a semi-finished petroleum product that is a key intermediate feedstock in the production of gasoline and diesel. It is produced through a process called vacuum distillation, which involves heating residual oil in a vacuum to lower its boiling point.

primarily collects, receives, and processes physical UMO co-products, such as oil filters and absorbents. Once collected, these products are crushed and compacted at a high pressure to remove any UMO, which is then pre-processed on-site before being transferred by rail or truck for further processing at the Marrero re-refining facility or one of the Company's other refining and processing facilities. The compacted steel then goes through a proprietary thermal desorption unit that removes any remaining oil from the metals. After the purification process is complete, the purified steel is shipped to local steel mills as a premium feedstock for the metal products they produce.

42. Finally, Debtor Vertex Recovery, L.P. owns and operates a UMO recovery services division that provides solutions for the proper recovery and management of hydrocarbon

 streams to large regional and national customers throughout the United States and Canada. The Company delivers these services through a fleet of custom-engineered tank and service trucks equipped to handle a wide variety of recovery efforts. A key feature of this specialized equipment is the regulatory compliant industrial vacuum trucks, which allows Vertex to remove waste materials, including oily sludges, solids, bottoms, oily water separators/grit traps, and other distressed hydrocarbon streams safely and reliably. Notably, the business line does not rely heavily on long-term contracts. Rather, Vertex principally participates in the spot market for such services and project-based work, which it bids on from time to time.

**3. Renewable Fuel Refining.**

43. As discussed above, the Company reconfigured and optimized the Mobile Refinery to take advantage of the opportunities presented by renewable diesel, sustainable aviation fuel, and green hydrogen. On May 27, 2023, the Mobile Refinery began processing

soybean oil into renewable diesel.  Between May 2023 and July 2024, the Mobile Refinery successfully produced renewable diesel; however, as I mentioned previously, a surplus of biofuels flooded the market after the refining industry increased biofuel production, which negatively impacted the Company's profit margins.

44.    As a result, in July 2024, the Company paused renewable fuel production at the Mobile Refinery and redirected the production back to conventional fuels and products. Although the Company believed that converting the facility would be value-maximizing in the long term, there was an initial capital strain in the short term from the cost of conversion and the absence of the revenue from renewable diesel or conventional refining.  Nonetheless, Vertex demonstrated its renewable diesel capabilities and was able to rectify the significant start-up issues common to many renewable diesel facilities in the time that it was operational.  If so desired, the Mobile Refinery can be reconverted back to produce renewable diesel in the future.

### Part II: The Debtors' Organizational and Capital Structure

**A.    Vertex's Organizational Structure.**

45.    As set forth on the structure chart attached hereto as **<u>Exhibit B</u>**, Debtor VEI is the Company's ultimate parent entity.  VEI was founded in 2001 and is headquartered in Houston, Texas.  VEI owns, directly or indirectly, twenty-three wholly owned subsidiaries, each of which are Debtors in these chapter 11 cases.  Debtor Vertex Recovery Management, LLC, maintains a 50 percent ownership interest in non-Debtor joint venture Vertex Recovery Management LA, LLC.

**B.    Prepetition Capital Structure.**

46.    Vertex's prepetition capital structure includes approximately $422.5 million in funded debt obligations as of the Petition Date, consisting of: (a) the Term Loan, (b) the Intermediation Facility, (c) various Finance Leases, (d) the 2027 Convertible Notes, and

(e) the Subordinated Unsecured Note.   As of the Petition Date, the Company's funded debt obligations can be summarized as follows:

| Facility | Maturity | Approximate Principal Amount Outstanding as of Petition Date |
|---|---|---|
| Secured Debt | | |
| Intermediation Facility | April 1, 2025 | $111.2 million[17] |
| Term Loan Facility | April 1, 2025 | $271.9 million |
| Finance Leases | -- | $23.8 million |
| Unsecured Debt | | |
| 2027 Convertible Notes | October 1, 2027 | $15.2 million |
| Subordinated Unsecured Note | November 30, 2024 | $0.4 million |
| Total Funded Debt Obligations | $422.5 million | |

1. **Intermediation Facility.**

47.   Debtor Vertex Refining is a party to that certain Supply and Offtake Agreement, dated as of April 1, 2022, by and among Vertex Refining and Macquarie (which agreement has been subsequently amended and modified from time to time and as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Amended Intermediation Facility" and together with the various related ancillary transaction documents, the "Intermediation Facility Agreement").

48.   Pursuant to the Intermediation Facility Agreement and related documents, Macquarie purchases from Shell Trading US Company approximately 100 percent of the feedstocks Vertex Refining requires to operate the Mobile Refinery and subsequently re-sells and delivers such feedstocks to Vertex Refining.  Upon delivery, the feedstocks are stored in tanks that are owned or leased by Vertex Refining until Vertex Refining draws the feedstocks from inventory for refining.  While the tanks are owned or leased by Vertex, Macquarie maintains legal title to the feedstocks stored in such tanks.

---

[17]   Amount as of September 12, 2024.

49.     After the feedstock has been drawn from the storage tanks and refined at the Mobile Refinery, Macquarie purchases from the Debtors substantially all of the refined product produced at the Mobile Refinery.  The sold product is then stored in Vertex Refining tanks until Macquarie re-sells and removes for delivery the re-sold product to various third parties, including Shell.  In certain circumstances, Vertex Refining may sell certain of its outputs pledged to Macquarie to various third parties, in exchange for first purchasing outputs from Macquarie. The terms of the Amended Intermediation Facility, as described in the Intermediation Facility Motion, were the best and most favorable available to the Debtors.

50.     The Intermediation Facility reduces and facilitates the Company's required working capital and serves as a critical component of the Debtors' ordinary course operations. Specifically, the Intermediation Facility shortens the working capital cycle of Vertex Refining by deferring its payment obligations for crude oil and accelerating receipt of funds for output produced.  The Intermediation Facility also mitigates against price risks related to a change in commodity prices of the inventory owned by Macquarie, among other things.

51.     The obligations of Vertex Refining under the Intermediation Facility are guaranteed by each of VEI and Vertex Renewables, LLC pursuant to (a) that certain guaranty agreement, dated as of April 1, 2022, by and between Macquarie and VEI and (b) that certain guaranty agreement, dated as of May 26, 2023, by and between Vertex Renewables, LLC and Macquarie.

52.     The Intermediation Facility matures on April 1, 2025, and is secured by liens on (a) approximately $10.5 million[18] in posted cash collateral held by Macquarie, (b) all inventory of Vertex Refining, and (c) all proceeds and supporting obligations of the foregoing

---

[18]    Amount as of September 12, 2024.

(the "Intermediation Facility Priority Collateral") on a senior first priority basis.[19]   As of the Petition Date, an aggregate amount of approximately $111.2 million in unpaid principal is outstanding under the Intermediation Facility.

53.     Pursuant to the Intermediation Facility Motion, the Debtors are requesting liens and superpriority administrative expense claims to Macquarie on account of obligations under the Intermediation Contracts.  Such liens and superpriority administrative expense claims will allow the Debtors to preserve the benefits of Prepetition Intermediation Facility (as defined in the Intermediation Facility Motion) and are essential to maximizing the value of the Debtors' estates.

**2.  Term Loan Facility.**

54.     The Debtors are party to that certain Loan and Security Agreement, dated as of April 1, 2022, by and among Vertex Refining, as borrower, Vertex Energy, Inc. as parent and as a guarantor, and each other Debtor, as guarantors, the lenders party thereto (collectively, the "Term Loan Lenders"), and Cantor Fitzgerald Securities, as Term Loan agent (which agreement has been subsequently amended and modified from time to time and as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Term Loan Agreement" and the facility thereunder, the "Term Loan Facility").

55.     The Term Loan Facility provided for an initial issuance of $125 million in first priority term loans and pursuant to subsequent amendments to the Term Loan Agreement, certain Term Loan Lenders provided the Debtors with an incremental $150 million in first priority term loans.  In connection with certain of the amendments to the Term Loan Agreement, the Debtors granted certain of the Term Loan Lenders warrants to purchase (a) 250,000 shares of VEI's common stock an exercise price of $9.25 per share, (b) 1,000,000 shares of VEI's common stock

---

[19]    To the extent the inventory owned by Macquarie were recharacterized as property of Vertex Refining, such recharacterized inventory would also constitute Intermediation Facility Priority Collateral.

at an exercise price of $3.00 per share, and (c) 500,000 shares of VEI's common stock at an exercise price of $1.23 per share.

56.     The Term Loan Facility provides for a non-default interest rate at the Base Rate plus 10.25% with an additional 2% per annum if an Event of Default has occurred and is continuing at the election of the Required Lenders.  Further, the Term Loan Facility matures on April 1, 2025, and is secured by (a) first priority senior liens on substantially all of the Debtors' real property and assets, other than the Intermediation Facility Priority Collateral, and (b) second priority liens on the Intermediation Facility Priority Collateral.  The liens and priorities of the Term Loan Facility and Intermediation Facility, and the related contractual rights of the parties thereto, are governed by that certain Intercreditor Agreement, dated as of April 1, 2022, by and among Cantor Fitzgerald Securities, as Term Loan agent, Macquarie, as Intermediation Facility representative, and Vertex Refining, along with the other acknowledging Debtors (which agreement has been subsequently amended and modified from time to time and as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Intercreditor Agreement").    As of the Petition Date, approximately $271.9 million in unpaid principal remains outstanding under the Term Loan Facility.[20]

**3.  Finance Leases.**

57.     The Debtors are party to various finance, storage, facility, equipment, and vehicle leases (the "Finance Leases") that they enter into as lessee, buyer or debtor in relation to the equipment subject thereto.  The key structural features of the Finance Leases are that the relevant lessor leases a specified piece of equipment, vehicle, or storage facility to the exclusive possession of the Debtors for a definite period of time in exchange for rent.  Vertex Refining

---

[20]     For the avoidance of doubt, this amount excludes fees, premiums, and interest and is limited to the Term Loan Facility principal.

assumes no obligations of outright ownership and has a buyout option at the end of each such Finance Lease.  As of the Petition Date, Vertex Refining is party to nine Finance Leases and the aggregate amount outstanding amount under the Finance Leases is approximately $23.8 million.

**4.  2027 Convertible Notes.**

58.    On November 1, 2021, VEI, as issuer, issued $155 million in aggregate principal 6.250% senior, unsecured 2027 Convertible Notes, maturing on October 1, 2027, (the "2027 Convertible Notes") pursuant to that certain indenture by and among the Company and U.S National Bank Association, as trustee (as amended, restated, supplemented, or otherwise modified from time to time, the "2027 Convertible Notes Indenture").  The 2027 Convertible Notes Indenture was entered into as part of the financing of the Company's 2022 acquisition of the Mobile Refinery.  Over the course of late May and early June of 2022, certain holders of the 2027 Convertible Notes exchanged (the "2022 Exchange") approximately $60 million of the 2027 Convertible Notes for 10.2 million newly issued shares of VEI's common stock and $1 million in cash.  On June 12, 2023, the Company and certain holders of the 2027 Convertible Notes closed on the exchange (the "2023 Exchange," and together with the 2022 Exchange, the "Exchange Transactions") of an approximately $79.9 million principal amount of the 2027 Convertible Notes for a combination of 17.2 million newly issued shares of common stock and cash of the Company.  Following the Exchange Transactions, approximately $15.2 million aggregate principal amount of the 2027 Convertible Notes remained outstanding.

**5.  Subordinated Unsecured Note.**

59.    Debtor H&H Oil is a party to that certain Subordinated Unsecured Promissory Note dated as of December 1, 2023 (as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Subordinated Unsecured

Note") in the amount of $1,466,677 by and between H&H Oil, as borrower, and Bright Star Environmental Services LLC ("Bright Star"), as lender. The Subordinated Unsecured Note is subject to the certain subordination agreement, dated as of December 1, 2023 (as may be further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Subordination Agreement") by and between Bright Star and Cantor Fitzgerald Securities for the benefit of Cantor Fitzgerald Securities, as Term Loan agent. The Subordination Agreement provides that any and all payments of senior indebtedness to the Term Loan agent and Term Loan Lenders are granted priority over any and all payment of the loans under the Subordinated Unsecured Note. The Subordinated Unsecured Note matures on November 30, 2024. As of the Petition Date, an aggregate amount of approximately $400,000 in unpaid principal is outstanding under the Subordinated Unsecured Note.

## 6. Equity Interests.

60. On February 13, 2013, VEI's common stock began trading on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol "VTNR". VEI's certificate of incorporation authorizes the board of directors to issue 750 million shares of common stock ("Common Shares") at $0.001 par value per share. As of the Petition Date, 93,514,346[21] Common Shares have been issued and are outstanding.

## Part III: Circumstances Leading to Chapter 11 Filing

### A. Challenges Facing the Debtors' Business.

### 1. Crack Spreads.

61. The oil and gas industry refers to the "crack spread" as a directional indicator of industry profitability. More specifically, crack spreads are a financial metric used to measure the

---

[21] Amount as of August 7, 2024.

profitability of refining crude oil into petroleum products like gasoline and diesel.  Crack spreads are expressed in ratios that depict the mix of various products that result from refining crude oil. Crack spreads involve (a) inputs, or the raw materials that refineries purchase (*i.e.*, the crude oil), (b) outputs, or the refined products such as gasoline and distillates, and (c) the spread, or the price between the inputs and the outputs.  Crack spreads reflect the directional profitability of certain refining configurations and do not account for transportation, crude quality differentials, location basis, differences in product mix or the value of products not included in the crack spread like propane, butane, residual fuel, or any petrochemical feedstocks to name just a few. As discussed, the crack spread is volatile and highly sensitive.  As a proxy for refining profitability, crack spreads are influenced by an amalgamation of market factors, including supply and demand dynamics, seasonal changes, geopolitical events, and changes in regulations affecting fuel standards.

62.    Like other refiners, Vertex utilizes crack spread calculations to evaluate profitability given price volatility in crude oil and refined products.  Accordingly, the Company looks to crack spreads for insight into the profitability of refining operations.  A wider spread indicates higher profitability, while a narrower spread suggests lower profitability.  With the exceptional market volatility of the last four years, crack spreads have been especially unstable. This instability has made it very difficult for the Company and other refiners to accurately project and plan for inputs required, consumer demands, and costs.  While refining is a cyclical business and the Debtors expect the market for refined products to ultimately rebalance, the significant tightening of crack spreads over the past two years has had a significant negative impact on the Debtors' profit margin.

2. **Renewable Fuels Regulatory Burden.**

63.     Enacted in 2005, the RFS Program is a federal program that is part of the Clean Air Act[22] and promotes the use of biofuels in on-road transportation fuel through its renewable volume obligation mandates.  Renewable transportation fuels are tracked through 38-character renewable identification numbers ("RINs"), which are physically "attached" to the fuel until it is either blended with non-renewable transportation fuel (*e.g.*, ethanol blending with gasoline) or used in its unblended form to displace a fossil transportation fuel (*e.g.*, renewable diesel).  Obligated parties demonstrate compliance with the RFS Program by retiring the RINs into a system controlled by the EPA after they have blended the renewable fuels through their own activities or those of other market participants.  Refiners that cannot blend enough renewable fuel to separate sufficient RINs to meet their RFS obligations can buy separated RINs on an unregulated secondary market.

64.     As of the Petition Date, the Debtors estimate that approximately $72.3 million in RIN obligations will need to be retired in the first quarter of 2025.[23]  This pending regulatory obligation has put a significant strain on the Debtors' capital structure that the Debtors must address during these chapter 11 cases in order to emerge as a going concern.

65.     On August 1, 2024, the Company's Advisors contacted the EPA regarding the possibility of discussing with the Debtors potential solutions to address the Debtors' outstanding RIN obligations.  The Company is preparing a petition that it plans to file with the EPA seeking

---

[22]   42 U.S.C. § 7545(o).

[23]   By the end of Q1 2025, the Company currently anticipates that it will owe approximately $72.3 million in RIN obligations (utilizing RIN spot prices as of September 13, 2024) related to 2023 and 2024 production activity.

an exemption from its renewable volume obligation mandates for 2022, 2023, and 2024 that is available to small refineries based on "disproportionate economic hardship."

### 3. Matheson Contracts.

66.     On June 11, 2022, Debtor Vertex Refining entered into the Matheson Agreement with Matheson pursuant to which Matheson agreed to build, own, operate, and maintain a new Hydrogen Facility at the Mobile Refinery.  Once complete, the Mobile Refinery was expected to increase production capacity of renewable diesel from approximately 8,000 bpd to approximately 14,000 bpd.

67.     In June 2023, following completion of the initial conversion phase of one section the Mobile Refinery to support renewable diesel production, the Company sold its first batch of renewable diesel from the Mobile Refinery.  The Company forecasted that the Mobile Refinery's renewable diesel production volumes would increase to approximately 8,000 bpd by the third quarter of 2023.  Unfortunately, reality fell far short of expectations.  By the end of 2023, conversion delays and logistical challenges severely limited the Debtors' renewable diesel production, and, as mentioned previously, the Mobile Refinery was only producing around 50 percent of the projected bpd.[24]

68.     Pursuant to the Matheson Agreement, the target commercial operations date for the Hydrogen Facility was August 2023, over a year ago.  As of the date hereof, based on an assessment recently conducted by A&M, which included a review of the current state of the project and an analysis of potential execution risks, I understand that A&M and the Company estimate that construction of the Hydrogen Facility's mechanical components will not be

---

[24]     Erin Voegele, *Vertex Shelves Renewable Diesel Production, Returns Unit to Fossil Fuel Production*, BIOMASS MAGAZINE (May 9, 2024), https://biomassmagazine.com/articles/vertex-shelves-renewable-diesel-production-returns-unit-to-fossil-fuel-production.

complete until late third quarter of 2025 at the earliest, meaning that the Hydrogen Facility is unlikely to be fully online and operational any earlier than the second quarter of 2026—almost *two years* beyond the originally set completion date.  The Company and A&M approximate that the delayed completion of the Hydrogen Facility has exposed the Company to looming liabilities of approximately $251 million that, pursuant to the Matheson Agreement, will only continue to balloon in tandem with the prolonged timeframe for completion.[25]  Moreover, my understanding is that the Company and A&M's July 2024 site visit to the Mobile Refinery eroded what little confidence they had left in Matheson's management of the project, which has, to date, resulted in significant construction delays and cost overruns.

69.     In light of this assessment, and for the reasons set forth in the Debtors' motion seeking rejection of the Matheson Agreement as of the Petition Date, filed contemporaneously herewith, the Debtors have determined in an exercise of their business judgment that it is in the best interests of all stakeholders to reject the Matheson Agreement.

**B.  The Company's Prepetition Restructuring Initiatives.**

**1.  Q4 2023 – Q1 2024 Marketing Process.**

70.     In the fall of 2023, the Company engaged Bank of America Securities ("BoA") to assist it in evaluating potential strategic options, including an investment in, or sale of, some or all of its business, a third-party capital raise, and a potential restructuring.  On October 16, 2023, the Company directed BoA to launch a marketing process for the sale of certain of the Company's assets, including the renewable diesel segment of the Mobile Refinery

---

[25]   It is my understanding that the increase in construction costs is tied to an increase in the monthly Base Facility Charge that the Company is required to pay upon completion of the Hydrogen Facility.  Specifically, pursuant to the terms of the Matheson Agreement, every $1 million increase in construction costs in excess of $60 million would result in a $13,700 increase in the Base Facility Charge.  Accordingly, assuming a total cost to completion of approximately $251 million, the Base Facility Charge would increase to approximately $3,654,440, from $1,035,000.  *See* Matheson Agreement §§ 8.1, 8.2.

(the "BoA Marketing Process").

71.     As part of the BoA Marketing Process, between the fourth quarter of 2023 and the first quarter of 2024, the Company and BoA reached out to 111 parties, shared 81 teasers, provided 75 draft non-disclosure agreements ("NDAs"), and executed 48 NDAs. Notwithstanding these efforts, the BoA Marketing Process ultimately yielded no actionable indications of interest; however, it did generate interest in the Company from several third parties, many of which have reiterated their interest in the Debtors' assets in the leadup to these chapter 11 cases.

**2.   Appointment of Disinterested Director.**

72.     On August 23, 2024, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the Company appointed Jeffrey S. Stein to the board of directors of VEI (the "Board") as an independent and disinterested director (the "Disinterested Director").

73.     On September 3, 2024, the Board delegated to the Disinterested Director, among other things, (a) exclusive authority in connection with any matters relating to a transaction in which a conflict of interest exists or is reasonably likely to exist between the Company or its stakeholders and the Board under applicable law (a "Conflict Matter"), (b) authority to investigate and determine, in the Disinterested Director's business judgment, whether any matter related to a transaction constitutes a Conflict Matter, and (c) non-exclusive authority to review, discuss, consider, negotiate, approve, and authorize the Company's entry into and consummation of a transaction.

74.     Over the course of the restructuring process, the Disinterested Director met with the Company's advisors and management team on numerous occasions to consider stakeholder feedback and provide guidance to Vertex's management team and advisors.

**3.    The 2024 Marketing Process.**

75.     In parallel with negotiations regarding the Company's potential entry into the Restructuring Support Agreement, the Company, with the assistance of PWP, launched a marketing process on September 3, 2024, to engage potential interested parties regarding a sale of all or substantially all of the Company's assets.   Prior to the commencement of these chapter 11 cases, PWP developed a confidential information memorandum and began contacting various potential buyers.  Now that the Company's chapter 11 process is public and the Debtors are seeking approval of bidding procedures to continue conducting its marketing process on a postpetition basis, the Debtors, with the assistance of PWP, are eager to engage with any party interested in participating in the Debtors' proposed sale process, within the confines of the bidding procedures.

**4.    Entry into the Restructuring Support Agreement.**

76.     As I previously discussed, following months of arm's-length negotiations between the Debtors and the Consenting Term Loan Lenders regarding the potential terms of a proposed value maximizing transaction, prior to commencing these chapter 11 cases, the Debtors and the Consenting Term Loan Lenders entered into the Restructuring Support Agreement.  The material terms of the Restructuring Transactions memorialized in the Restructuring Support Agreement are further set forth in the Plan filed contemporaneously herewith.   In accordance with the anticipated liquidity runway provided by the DIP Facility, and to promote expediency in these chapter 11 cases, the Debtors have agreed to seek approval of the below-proposed timeline for these chapter 11 cases, as set forth in certain of the First Day Motions.  I believe that the timeline is reasonable under the circumstances and will ensure that these chapter 11 cases are value-maximizing for the Debtors and their stakeholders.

77.     The chart below details the Debtors' proposed path forward to move swiftly through these chapter 11 cases:

| Event | Proposed Bidding Procedures / Scheduling Order Dates | RSA / DIP Milestones |
|---|---|---|
| IOI Deadline | Wednesday, October 23 | Monday, October 29 |
| Disclosure Statement Order | Friday, November 8 | Tuesday, November 13 |
| Credit Bid Sale Order | Monday, November 18 | Monday, December 3 |
| Third-Party Bid Deadline | Friday, November 22 | Wednesday, November 28 |
| Auction | Monday, November 25 | N/A |
| Third Party Sale Order | Monday, December 16 | Sunday, December 23 |
| Confirmation Order | Tuesday, December 17 | Friday, December 28 |
| Plan Effective Date | N/A | Thursday, January 17 |

78.     Based on discussions with the Company's management team and advisors, I believe that the proposed case timeline set forth in the First Day Motions, in conjunction with the milestones set forth in the Restructuring Support Agreement and the DIP Credit Agreement, appropriately balances the need for the Debtors to move towards confirmation of the Plan as quickly as possible and emergence from these chapter 11 cases, in each case, in accordance with the due process and notice requirements set forth in the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

**C.  Postpetition Financing and Use of Cash Collateral.**

**1.  The DIP Facility.**

79.     Based on my understanding of A&M's analysis of the Debtors' financing needs, I believe that the Debtors require immediate access to the proposed DIP Facility and continued use of Cash Collateral.  Access to the DIP Facility and Cash Collateral is critical to ensure that the Debtors are able to successfully administer their chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and pursue the value-maximizing restructuring transactions contemplated under the Restructuring Support Agreement and Plan, including funding their postpetition sale and marketing process.  During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on

hand, to, among other things, (a) satisfy payroll obligations, (b) honor obligations under their material contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.

80.     In connection with preparing for a potential chapter 11 filing and determining the Debtors' postpetition financing requirements, A&M worked with the Debtors and their Advisors to prepare projected cash forecasts for the Debtors' businesses during these chapter 11 cases.  It is my understanding that these projections reflect a number of factors, including, but not limited to, the effect of the chapter 11 filings on the Debtors' businesses and ability to continue operating in the ordinary course, the relative stability and predictability of crack spreads, restructuring costs (including professional fees and adequate protection payments), and required operational payments.  The thirteen-week cash flow forecast projects the Debtors' anticipated cash receipts and disbursements during the thirteen-week period following the Petition Date, and I believe the Initial Budget provides a reasonable estimate of the Debtors' capital needs during the postpetition period.

81.     As of the Petition Date, the Debtors' total cash balance is approximately $4 million, which is insufficient to finance the Debtors' working capital needs and costs of administering these chapter 11 cases.  Accordingly, the Debtors seek access to the liquidity provided by the $280 million DIP Facility during the pendency of these chapter 11 proceedings. If approved, the DIP Facility will provide the Debtors with access to $80 million of new money for use during these chapter 11 cases, of which approximately $39.4 million will be made immediately available upon interim approval.

82.     Without immediate access to the DIP Facility and Cash Collateral, the Debtors could face a value-destructive interruption to their businesses and lose support from important stakeholders on whom the Debtors' businesses depend.  This, in turn, would force the Debtors to curtail operations, hindering the Debtors' ability to effectuate the restructuring transactions contemplated in the Restructuring Support Agreement and maximize the value of their estates.

83.     As laid out more fully in the Declaration of Douglas McGovern in support of the Debtors' DIP Motion, the DIP Facility is the culmination of extensive prepetition negotiations between the Debtors, on the one hand, and the Consenting Term Loan Lenders, on the other hand, and is the best proposal for postpetition financing that the Debtors received.

84.     I believe that the terms of the DIP Facility, and the form and amount of adequate protection provided to the DIP Lenders, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates.

**2.  The Amended Intermediation Facility.**

85.     Concurrently with the successful negotiations of the Restructuring Support Agreement and the DIP Facility, the Debtors sought to reach resolution regarding the final significant piece of their postpetition financing—continuation of the Intermediation Facility during the course of these chapter 11 cases.  As noted above, the Debtors have historically financed their crude oil and feedstock purchases through the Intermediation Facility, whereby, on a monthly basis, Macquarie agrees to purchase crude oil and other feedstocks to supply to the Mobile Refinery.  The Debtors draw from this reserve to supply all of Mobile Refinery's daily input need, and Macquarie then purchases the refined oil and/or other outputs before selling to third parties, subject to agreed variable interim daily product pricing.  The Debtors' earnings, cash flows, and liquidity—like that of other owners and operators of refineries—depend primarily on the margin above operating expenses at which the Debtors are able to sell refined

products.  The Debtors' operating margin is consequently determined by the cost of the refining process, which is, in part, derived from the difference between the price at which the Debtors acquire the inputs (*i.e.*, through Macquarie for the benefit of the Debtors) to the refining process relative to the price at which the Debtors are able to sell their outputs.

86.     Following extensive, arm's-length negotiations between the Debtors, Macquarie, and the DIP Lenders, on the date hereof, the parties reached an agreement and executed an amendment to the Intermediation Facility Agreement.  Importantly, the Amended Intermediation Facility will allow Vertex Refining to continue to enter into and perform intermediation transactions with Macquarie, who agreed to forbear from exercising remedies under the Intermediation Facility Agreement in place prior to the Petition Date.  In exchange, the Debtors will provide senior liens and superpriority status to Macquarie on account of Vertex Refining's obligations under the Intermediation Contracts.  Such senior liens on the Intermediation Facility Priority Collateral and superpriority status with respect to all of Vertex Refining's obligations under the Intermediation Facility Agreement (whether arising prepetition or postpetition) in respect of intermediation transactions.

### 3.  The Macquarie Hedging Arrangements.

87.     Pursuant to that certain ISDA Master Agreement, dated as of March 31, 2022, Vertex Refining and Macquarie Bank Limited agreed to perform certain hedging arrangements (the "Prepetition Hedging Arrangements") related to the Prepetition Intermediation Facility.  In connection with the Debtors' requested approval of the Amended Intermediation Facility, the Debtors are seeking authority to continue performing under the Prepetition Hedging Arrangements, as well as authority to enter into and perform under postpetition hedging arrangements, as embodied in the Amended Intermediation Facility (the "Postpetition Hedging

Arrangements" and together with the Prepetition Hedging Arrangements, the "Hedging Arrangements").

88.     The Debtors entered into the Prepetition Hedging Arrangements in their business judgment as part of the extensive, arm's-length negotiations with Macquarie regarding the Amended Intermediation Facility.  The Debtors and Macquarie have agreed to continue these hedging transactions pursuant to the Hedging Arrangements in order to maximize the value of the Debtors' estates, to the benefit of all stakeholder and creditors.  The Debtors' entry into the Hedging Arrangements is a critical term of the Amended Intermediation Facility and Macquarie would not have entered into the Amended Intermediation Facility if the expanded Hedging Arrangements were not included.

**4.    The Shell Support Agreement.**

89.     In connection with the Debtors' performance under the Intermediation Facility Agreement, the Debtors are party to critical agreements with Shell that facilitate the supply and purchase of refined products from Macquarie under the Prepetition Intermediation Facility.  To ensure continued performance by Shell under its prepetition contracts (the "Shell Agreements") and preserve a stable supply of crude and, in turn, cash flow to the Debtors during these chapter 11 cases, the Debtors and their Advisors negotiated a support agreement with Shell (the "Support Agreement") in good faith and at arm's-length.  Importantly, the Shell Agreements are forward contracts, so Shell would be free to walk away at any point, absent the Support Agreement.

90.     Pursuant to the Shell Support Agreement, the parties have agreed that, among other things:  (a) Shell shall not exercise Termination Rights (as defined in the Shell Agreements) under the Shell Agreements or Tripartite Agreements (as defined in the Intermediation Motion), so long as no Event of Default (as defined in the Shell Support

Agreement) has occurred and is continuing; (b) Shell shall not impose more restrictive conditions beyond what the Debtors have provided or posted pursuant to the Shell Agreements or Tripartite Agreements, so long as the Debtors comply with the terms of the Shell Support Agreement; (c) the Debtors will (i) make all payments when due and in the ordinary course (other than termination payments for which Shell may file any necessary claims, as appropriate) as may be required under the Shell Agreements and the Tripartite Agreements (unless expressly amended pursuant to the Shell Support Agreement or otherwise agreed to in writing by Shell and the Debtors); (ii) perform and pay all postpetition obligations under the Shell Agreements at the prices specified in the Shell Agreements and the Tripartite Agreements; (iii) superpriority administrative claim status pursuant to section 364(c)(1) for amounts owed by the Debtors to Shell on account of postpetition transactions under the Shell Agreements and the Tripartite Agreements (including, if applicable and subject to the terms thereof, any actual reasonable and documented costs incurred postpetition by Shell for any accepted postpetition mandates or postpetition changes in prepetition elections under the Shell Agreements or the Tripartite Agreements by the Debtors subject to Shell's duty to mitigate any such costs) subject only to superpriority administrative claims granted in respect of the DIP Facility, continuation of the Intermediation Facility on a postpetition basis, and to any carve-outs specified in connection therewith, including, for the avoidance of doubt, the professional fee carve-out; (iv) to the extent the minimum liquidity compliance requirement under the DIP Loan Agreement is changed, provide Shell with notice of such change within twenty-four (24) hours of such change being approved by the lenders under the DIP Loan Agreement; (v) comply with the following milestones: (x) no later than three (3) days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Interim Order; (y) no later than

thirty (30) days after the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Final Order; and (z) no later than one hundred and fifteen (115) days after the Petition Date, the Debtors shall have consummated a sale under section 363 of the Bankruptcy Code or confirmed a chapter 11 plan, subject to extension or waiver of such milestones by Macquarie, *provided* that the Debtors shall use reasonable best efforts to provide Shell with two (2) days' written notice of any request to extend such milestones; and (vi) the Debtors shall pay the reasonable and documented fees and out-of-pocket expenses of Shell's primary legal counsel incurred in connection with or enforcement of the Shell Support Agreement in these chapter 11 cases.

91.     Entering into the Support Agreement will help maximize the value of the Debtors' estates by providing a stable supply of crude to the Debtors during these chapter 11 cases and a buyer for Macquarie to sell Vertex Refining's refined products.   The loss of the Shell Agreements during these chapter 11 cases would materially impact the Debtors' operations and could jeopardize the Debtors' ability to continue to intermediate with Macquarie.  As a result, I believe entering into the Support Agreement, and granting the related Support Agreement Superpriority Claims, is in the best interests of the Debtors' estates.

### Part IV: Evidentiary Basis for Relief Requested in the First Day Motions

92.     Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking relief to minimize the adverse effects of the commencement of these chapter 11 cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.   Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their

business with minimal disruption and thereby preserving value for the Debtors' Estates and various stakeholders.  The First Day Motions[26] include:

**A. Administrative Motions.**

1. *Notice of Designation as Complex Chapter 11 Bankruptcy Case* (the "<u>Complex Case Designation</u>");

2. *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>");

3. *Debtors' <u>Emergency</u> Motion for Entry of an Order Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* (the "<u>Scheduling Motion</u>");

4. *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (B) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of Equity Security Holdings, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>");

5. *Debtors' <u>Emergency</u> Motion for Entry of an Order Extending Time to File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, (IV) Statements of Financial Affairs, and (V) Rule 2015.3 Financial Reports* (the "<u>SOFAs / Schedules Extension Motion</u>"); and

6. *Debtors' <u>Emergency</u>* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants, LLC dba Verita Global as Claims, Noticing, and Solicitation Agent* (the "<u>Claims Agent Retention Application</u>"*).*

**B. Operational Motions Requesting Immediate Relief.**

1. *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>");

---

[26] Capitalized terms used but not defined in this section have the correlative meaning ascribed to such term as in the corresponding First Day Motion, as applicable.

2. *Debtors' __Emergency__ Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Employee Benefits Programs and (III) Granting Related Relief* (the "__Wages Motion__");

3. *Debtors' __Emergency__ Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "__Taxes Motion__");

4. *Debtors' __Emergency__ Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "__Utilities Motion__");

5. *Debtors' __Emergency__ Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* (the "__NOL Motion__");

6. *Debtors' __Emergency__ Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, Purchase, and Enter Into New Insurance Policies, (C) Honor Prepetition Payment Arrangements, (D) Continue to Pay Brokerage Fees, and (E) Maintain the Surety Bond Program and (II) Granting Related Relief* (the "__Insurance Motion__");

7. *Debtors' __Emergency__ Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Status, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "__DIP Motion__");

8. *Debtors' __Emergency__ Motion for Entry of Interim and Final Orders (I) Authorizing Continuation of the Intermediation Contracts, as Amended, (II) Authorizing the Debtors to Enter Into and Perform Postpetition Intermediation Transactions, (III) Providing Superpriority Administrative Expense Status in Respect of Postpetition Intermediation Transactions, (IV) Providing First Priority Liens in Respect of the Intermediation Collateral, (V) Providing Superpriority Administrative Expense Status in Respect of Shell Support Agreement, (VI) Modifying the Automatic Stay, (VII) Setting a Final Haring, and (VIII) Granting Related Relief* (the "__Intermediation Facility Motion__");

9. *Debtors' __Emergency__ Motion for Entry of an Order (I) Authorizing Continuation of Prepetition Hedging Arrangements, (II) Authorizing Entry Into and Performance Under Postpetition Hedging Arrangements, (III) Providing Superpriority Administrative Expense Status in Respect of Postpetition Hedging Arrangements, (IV) Modifying the Automatic Stay and (V) Granting Related Relief* (the "__Hedging Motion__"); and

10. *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Critical Vendors, and (D) HSE Suppliers, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "<u>Critical Vendors Motion</u>").

**C. Bidding Procedures Motion.**

1. *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Bidding Procedures and Auction, (II) Scheduling Bid Deadlines, an Auction, Objection Deadlines, and a Sale Hearing, (III) Approving the Assumption and Assignment Procedures, (IV) Approving the Form and Manner of Notice of a Sale Transaction, the Auction, the Sale Hearings, and Assumption and Assignment Procedures, (V) Authorizing the Sale of the Debtors' Assets Free and Clear of All Encumbrances, and (VI) Granting Related Relief* (the "<u>Bidding Procedures Motion</u>").

93.     The First Day Motions seek authority to, among other things, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to preserve the value of their enterprise and successfully implement their restructuring.

94.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

95.     Several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the extent relief is

necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

96.     Specifically, with respect to the relief requested in the Critical Vendors Motion, the Debtors' business is dependent upon strong relationships with vendors for certain critical services, logistics, refinery expenses, capital expenditures, raw materials, regulatory and environmental compliance, and other materials the Debtors depend upon to operate their businesses.  The Debtors obtain such services, equipment, or parts from a number of highly specialized vendors, service providers, and other businesses —often on an order-by-order basis and without long-term contracts—replacement of which likely would be impossible or would result in substantially higher costs for the Debtors.  Further, certain Critical Vendors (as defined in the Critical Vendors Motion) are the sole source providers of replacement parts necessary to maintain the Debtors' equipment, and the inability to acquire these parts would result in the deterioration of the Debtors' equipment.

97.     The Debtors rely on timely and frequent delivery of these materials, equipment, parts, and any interruption in this supply—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' businesses, goodwill, employees, customer base, market share, and, potentially, compromise the Debtors' ability to comply with certain health and safety regulations.  Such harm would likely far outweigh the cost of payment of certain of the prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business.

98.     Additionally, the Debtors rely on the Lien Claimants (as defined in the Critical Vendors Motion) who may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.  These Lien Claimants provide key goods and services for the maintenance and operation of the Debtors' facilities and supply chain, including manufacturing, mechanical, construction, transportation, or freight services.  If the Lien Claimants do not receive payment, they may refuse to provide further services and to release the Debtors' supplies or products, which would impede the Debtors' use of their property until such claims are satisfied.

99.     The Debtors believe that continuing to pay the Critical Vendors, as well as the 503(b)(9) Claimants, Lien Claimants, and HSE Suppliers, as and when they become due in the ordinary course of business will induce the vendors to continue to provide the Debtors' essential products, services, and materials on a go forward basis and, thereby, afford the Debtors a smooth transition into chapter 11.  Absent the relief requested in the Critical Vendors Motion, the Debtors risk losing access to critical products and services which would jeopardize operations and diminish the value of the Debtors' estates to the detriment of all stakeholders.  Absent the ability to continue honoring obligations to such vendors, the Debtors' ability to continue utilizing such vendors' services may be imperiled, which would, in turn, jeopardize certain of the Debtors' key customer relationships and their ability to maintain or capture additional business therefrom.

100.    For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these chapter 11 cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 25, 2024

/s/ *R. Seth Bullock*
Name: R. Seth Bullock
Title:   Chief Restructuring Officer of Vertex Energy, Inc.