IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| VERTEX ENERGY, INC., *et al.*,[1] | ) ) ) | Case No. 24-90507 (CML) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF JEFFREY S. STEIN IN
SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT
CHAPTER 11 PLAN OF VERTEX ENERGY, INC. AND ITS DEBTOR AFFILIATES**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey S. Stein, hereby declare as follows under penalty of perjury:

1. I am a disinterested director of the board of directors (the "Board") of Vertex Energy, Inc. (together with its affiliated debtors and debtors in possession, the "Debtors"). I submit this declaration (this "Declaration") in support of confirmation of the Debtors' *Second Amended Joint Chapter 11 Plan of Vertex Energy, Inc. and Its Debtor Affiliates* [Docket No. 564] (as modified, amended, or supplemented from time to time, the "Plan").[2] The statements in this Declaration are, except where specifically noted, based on my personal knowledge of the matters set forth herein. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vertex. The location of Debtor Vertex Energy, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1331 Gemini Street, Suite 250, Houston, Texas 77058.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Vertex Energy, Inc. and Its Debtor Affiliates* [Docket No. 426] (the "Disclosure Statement"), or the Bidding Procedures Motion (as defined herein), as applicable.

**Background and Qualifications**

2. I have over 30 years of experience in the distressed investing and restructuring industry. I am regularly engaged as an officer and director of companies experiencing significant challenges, including financial and operational restructurings, complex contract renegotiations and litigation, and increased regulatory oversight. I have previously served as the Chief Executive Officer and Chief Restructuring Officer of Rite Aid Corp. and GWG Holdings, Inc., the Chief Restructuring Officer of Liberty Steel Group Holdings Pte. Ltd., Whiting Petroleum Corporation, Philadelphia Energy Solutions, LLC, and Westmoreland Coal Company, and the Executive Chairman of Ambac Assurance Corporation and MLR Petroleum LLC. Additionally, I have served as an independent director or manager in several other restructuring engagements in addition to these Chapter 11 Cases, including Nordic Aviation Capital (NAC) 29, Seadrill North Atlantic Holdings Limited, Intelsat Connect Finance S.A., NMC Health Plc, and Toys "R" Us, Inc. I hold a Master of Business Administration in Finance and Accounting from New York University and a B.A. in Economics from Brandeis University.

**Appointment as the Disinterested Director**

3. On August 23, 2024, I was appointed to the Board as an independent and disinterested director. On September 3, 2024, the Board unanimously adopted a resolution delegating certain powers and authorities to me in my capacity as an independent and disinterested director, including among other things, (a) exclusive authority in connection with any matters relating to a transaction in which a conflict of interest exists or is reasonably likely to exist between the Debtors or its stakeholders and the Board under applicable law (a "<u>Conflict Matter</u>"), (b) authority to investigate and determine, in my business judgment, whether any matter related to a transaction constitutes a Conflict Matter, and (c) non-exclusive authority to review, discuss,

consider, negotiate, approve, and authorize the Company's entry into and consummation of a transaction.

4. Since my appointment to the Board, the Debtors' advisors have kept me apprised of the Debtors' marketing and sale process of the Debtors' assets (the "Marketing Process"), negotiations with those certain Holders of Term Loan Claims (the "Term Loan Lenders"), and the status of these Chapter 11 Cases.

**Evaluation of Certain Plan Terms**

5. Over the course of the past four months, I have, as the sole Disinterested Director, with the advice and assistance of Kirkland & Ellis LLP ("Kirkland") and the Debtors' other advisors and professionals, reviewed and analyzed certain of the Debtors' historical transactions as well as potential claims held by the Debtors. In connection with my review, and with the advice and assistance of Kirkland, I assessed the reasonableness and appropriateness of the releases, exculpations, and injunction provisions in the Plan under the circumstances (the "Investigation"). At my direction, Kirkland has reviewed substantial diligence, including approximately 300 documents (including equity purchase agreements, asset purchase agreements, sale agreements, and financing agreements) and Board minutes, and Kirkland conducted multiple interviews of the Debtors' directors, officers, and employees. Further, in connection with the Investigation, Kirkland held multiple conferences with the Debtors' counsel, its advisors, and other relevant operational teams to assess potential claims.

6. Throughout the course of the Investigation, I communicated with Kirkland and received updates on the workstreams, progress, and findings of the Investigation. During these meetings, I was engaged and asked questions based on my experience regarding the facts being presented and potential applicable legal theories.

7. On December 18, 2024, after having received and evaluated a detailed 45-page privileged legal presentation providing analysis of potential estate Claims and Causes of Action from Kirkland, Kirkland presented its final analysis of its findings. Upon further review, evaluation, and discussion with Kirkland, I concluded that the releases, exculpations, and injunction provisions that the Debtors proposed under the Plan are fair and reasonable and in the best interest of the Debtors' estates.

A. **The Debtor Release Is Appropriate.**

8. Based on my findings from the Investigation, I concluded that the scope of the Debtor Release is reasonable and appropriate. Among other things, the Investigation did not uncover any viable estate claims that, if litigated, are likely to produce value for the Debtors' estates, and the Plan is affirmatively supported by key stakeholders of the Debtors, including the DIP Lenders, the Term Loan Lenders, and the Committee. In reaching this conclusion, I also considered, among other things, that the Restructuring Transactions embodied in the Plan (including the releases, exculpations, and injunction provision) were negotiated at arms' length over multiple months by sophisticated parties and counsel.

9. The Debtors and the Debtors' directors, officers, employees, advisors, the Term Loan Lenders, the Committee, and its members, among other Released Parties, were critical participants in the Plan process, both in terms of negotiating and formulating a consensual deal for the benefit of all stakeholders, voting in favor of the Plan, and/or cooperating with the Investigation. Absent the support of these stakeholders, I believe the Debtors would not have been able to secure DIP financing to fund these Chapter 11 Cases, would not have been able to secure a postpetition intermediation facility to facilitate the purchase and sale of feedstock to replenish inventory during these Chapter 11 Cases, would not have been able to run an orderly and robust Marketing Process, and would not have been able to obtain the votes necessary to confirm the Plan

on this expedited timeline. I believe that the strong support and contributions from the Debtors' various stakeholders from the outset of these Chapter 11 Cases was in part because the Debtors agreed to provide the Debtor Release contemplated in the Plan, subject to the findings of the Investigation discussed herein. Accordingly, I believe the Debtor Release is appropriately tailored, given the carve-out for actual fraud, willful misconduct, and gross negligence, and appropriately offers protection to parties that contributed to, and participated in, the Debtors' restructuring process.

10. Further, I understand that the Debtors' internal counsel has overseen the administration of these Chapter 11 Cases, including the scope and work performed by the Debtors' retained professionals. It is my understanding that the Debtors, as independently represented by their internal counsel, Kirkland, as restructuring counsel, and Bracewell LLP, as co-counsel and conflicts counsel for the Debtors, have assessed the Plan, including the Debtor Release contained therein, and the Debtors are supportive of the Debtors' pursuit of confirmation of the Plan and the grant of the Debtor Release.

### B. The Third-Party Release Is Consensual and Appropriate.

11. In addition to the Debtor Release, I understand that the Plan provides the opportunity for certain Releasing Parties to affirmatively provide releases to the Released Parties in exchange for a mutually beneficial release (the "Third-Party Release"). It is my understanding that the Third-Party Release was a negotiated term of the Plan and I believe that the Third-Party Release is consensual because it affects only the parties who have affirmatively opted in to grant the Third-Party Release, and I believe that it is an integral element of the Plan, is fair, equitable and reasonable, and in the best interests of the Debtors and their Estates. Accordingly, for all of the above reasons, I believe that the Debtors have a good-faith basis for including the Third-Party

Release in the Plan and that the Third-Party Release is reasonable and appropriate in light of the facts and circumstances of these Chapter 11 Cases.

    C.  **The Exculpation Provision Is Appropriate.**

  12.  I have also reviewed the exculpation provision (the "Exculpation Provision") provided in Article VIII.E of the Plan. I understand that the Exculpation Provision was formulated following extensive good-faith, arm's-length negotiations with the Debtors' key stakeholders and it is supported by the Term Loan Lenders and the Committee. I believe that the Exculpation Provision is an integral component of the Plan and is appropriately limited in scope. Specifically, the Exculpation Provision carves out actual fraud, willful misconduct, and gross negligence, and I understand the Exculpated Parties are relying upon the protections often afforded to the constituents who have performed valuable services in connection with the Debtors restructuring. Further, I do not believe that the 1125(e) Exculpated Parties would have been willing to participate in the Debtors' restructuring efforts absent assurances that they would be exculpated for their conduct during these Chapter 11 Cases to the extent they acted in good faith. Accordingly, I believe the Exculpation Provision is a necessary component of the Plan and the protections afforded by the Exculpation are reasonable and appropriate.

    D.  **The Injunction Provision Is Appropriate.**

  13.  I have reviewed the injunction provision in Article VIII.F of the Plan (the "Injunction Provision"). I believe the Injunction Provision is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions. Further, I believe the Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to these Chapter 11 Cases and the Restructuring Transactions by requiring the Bankruptcy Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are

reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation Provision.

14. I also believe that the "gatekeeper" provision contained in the Injunction Provision is a material and necessary term of the Plan.  The purpose of the gatekeeper provision is to further protect the Debtors and other Released Parties from meritless litigation and to safeguard against consensually Releasing Parties failing to honor the release that they affirmatively and consensually granted.  Accordingly, considering the broad support for the Plan from nearly all stakeholders, along with the importance of the gatekeeper provision, I believe the gatekeeper provision contained in the Injunction Provision is in the best interest of the Debtors' Estates.

15. Based on these considerations, as an independent and disinterested director of the Board, I determined that the Plan is fair, reasonable, and in the best interests of the Debtors and their Estates, and that the Debtor Release, the Third-Party Release, the Exculpation Provision, and the Injunction Provision should be approved as part of confirmation of the Plan.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 20, 2024

/s/ *Jeffrey S. Stein*
Jeffrey S. Stein
Independent and Disinterested Director of the
Board of Vertex Energy, Inc.